UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | Case No. 16bk36934 |
| Direct Media Power, Inc., | Chapter 7 |
| Debtor. | Judge Timothy A. Barnes |

TIMOTHY A. BARNES, Judge.

## MEMORANDUM DECISION

Before the court is Creditor Radio One, Inc.'s Second Amended Motion for Civil Contempt [Dkt. No. 179] (the "Motion") brought by Radio One, Inc. ("Radio One"), in the above-captioned bankruptcy case. The Motion is opposed by the debtor, Direct Media Power, Inc. ("DMP"), and its president Dean Tucci ("Tucci").

The Motion raises serious concerns regarding postpetition treatment of bankruptcy estate property by DMP and Tucci in managing DMP. For the reasons set forth more fully below, upon review of the parties' respective filings and after conducting a hearing on the matter, the court finds that DMP and Tucci violated court orders in this case. Such violations give rise to civil contempt. Radio One is therefore entitled to contempt damages, which the court determines to be the attorneys' fees Radio One incurred as a result of DMP's and Tucci's contempt. The Motion should be, therefore, and by a separate order entered concurrently herewith is, granted.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code, or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred may enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Bankruptcy judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the court may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the bankruptcy court may hear the matters, but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1) & (c). Instead, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed

1

findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

The court must also consider its constitutional authority. *Stern v. Marshall*, 564 U.S. 462 (2011). The court's section 105 powers arise only in bankruptcy and are essential to the administration of bankruptcy matters. *In re Caesars Entm't Operating Co., Inc.*, 808 F.3d 1186, 1188 (7th Cir. 2015) (section 105 "grants the extensive equitable powers that bankruptcy courts need in order to be able to perform their statutory duties"). As such, the exercise of those powers is squarely within the court's constitutional authority. In the matter at bar, DMP and Tucci have contested the court's authority and jurisdiction to hear and determine violations of this court's orders during the bankruptcy case after the case itself was dismissed. That is a different question.

While the court will consider in greater detail below its contempt powers, there is no question that a bankruptcy court ordinarily has authority to enforce its own prior orders. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 138 (2009); *Cox v. Zale Del., Inc.*, 239 F.3d 910, 917 (7th Cir. 2001). Congress expressly conferred enforcement powers to the bankruptcy courts in section 105 of the Bankruptcy Code, which authorizes the court to take "any action ... necessary or appropriate to enforce or implement court orders or rules." 11 U.S.C. § 105(a); *Owens v. LVNV Funding, LLC*, 832 F.3d 726, 732 n.5 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 2157 (2017); *In re Bryson*, 131 F.3d 601, 603 (7th Cir. 1997); *In re Volpert*, 110 F.3d 494, 500 (7th Cir. 1997).

Although the bankruptcy case was dismissed on September 20, 2017, that authority remained. "A court loses jurisdiction over a case when it issues a final judgment, which is to say a judgment that resolves the controversy between the parties. The order dismissing the bankruptcy didn't do that." *In re Sweports, Ltd.*, 777 F.3d 364, 367 (7th Cir. 2015). After the dismissal of the underlying bankruptcy case, the bankruptcy court may retain jurisdiction to consider collateral issues, such as the imposition of sanctions. *In re Dental Profile, Inc.*, 446 B.R. 885, 890 (Bankr. N.D. Ill. 2011) (Cox, J.) (*citing In re Kitchin*, 327 B.R. 337, 359 (Bankr. N.D. Ill. 2005) (Schmetterer, J.)). As in *Sweports*, a court may have continuing jurisdiction to resolve the controversy between parties despite the court's prior order dismissing the bankruptcy.

Here, in addition to the foregoing, at the dismissal hearing the court expressly retained jurisdiction to resolve the issue at bar. Accordingly, the court has jurisdiction and constitutional authority to enter final orders with respect to the Motion.

## BACKGROUND AND PROCEDURAL HISTORY

The debtor in this bankruptcy case, DMP, is wholly-owned by DMP Holdings, Inc. ("Holdings"), also an Illinois corporation. In turn, Tucci owns ninety percent of Holdings. In addition to his control of DMP through Holdings, Tucci serves as the president of DMP. Tucci also owned a majority interest of other business entities that he managed during the bankruptcy case, including Teldebt Solutions, Inc. ("Teldebt"), FDATR, Inc. ("FDATR"), Dang Enterprises LLC ("Dang") and The Media Liquidators, Inc. ("Liquidators" and collectively with Holdings, Teldebt, FDATR and Dang, the "Affiliated Entities").

2

On November 21, 2016 (the "Petition Date"), DMP filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petition") through the assistance of its initial bankruptcy counsel, Adam S. Tracy ("Tracy"), commencing the above-captioned case.

DMP failed to perform many of the requirements of a debtor within 14 days of filing the Petition. For example, the Petition did not include many of the required documents and those that were filed were deficient (*e.g.*, Form B4 – the List of Creditors Holding 20 Largest Unsecured Claims – omitted most of DMP's significant creditors).

On December 2, 2016, the United States Trustee (the "U.S. Trustee") filed a motion to dismiss this case under section 1112(b) of the Bankruptcy Code for these failures and the failure to timely provide information reasonably requested by the U.S. Trustee. Shortly thereafter, Tracy withdrew his request for authority to represent DMP, leaving DMP unrepresented in the case. At the hearing on the U.S. Trustee's motion to dismiss, attorney Neal L. Wolf ("Wolf") stepped in as DMP's counsel and requested and was granted time to address the deficiencies. Also at the hearing, Radio One appeared and voiced preliminary concerns regarding the case.

A.      The First Interim Cash Collateral Order

Through Wolf's efforts, a number of the deficiencies were corrected and, in response, the U.S. Trustee withdrew its motion to dismiss. Among the new filings was an overdue request for authority to use cash collateral. *See* Debtor's Motion for Entry of Order (A) Authorizing Use of Cash Collateral on an Interim Basis, and Providing for Adequate Protection, and (B) Setting a Final Hearing on the Use of Cash Collateral dated December 15, 2016 [Dkt. No. 36] (the "Cash Collateral Motion"). On December 19, 2016, the court granted the Cash Collateral Motion on an interim basis. *See* Interim Order Authorizing Use of Cash Collateral and Approving Grant of Adequate Protection and Setting Final Hearing on the Use of Cash Collateral [Dkt. No 52] (the "First Interim Order").[1] The First Interim Order set January 11, 2017, as a further hearing on the Cash Collateral Motion.

Thereafter, authority to use cash collateral was ordered periodically on a further interim basis as follows:

---

[1]      In the Northern District of Illinois, bankruptcy filers are required to include proposed orders with their motions. *See* Bankr. N.D. Ill. R. 9013-1(B)(5). Despite the best efforts of the court, parties continue to submit orders that are not self-referential and occasionally such orders are entered. The First Interim Order is just such an order, granting authority to use the cash collateral of "Lender," a term defined neither in the Interim Order nor the Cash Collateral Motion. The form of order was, however, served with the Cash Collateral Motion and even the most cursory review of the Cash Collateral Motion reveals that the lenders addressed therein, defined as the "Secured Creditors" are: Radio One, MCA Fixed Payment, New Era Lending and Ace Funding Source. Taken together, it is clear that the First Interim Order grants authority to use the cash collateral of the Secured Creditors, including Radio One.

(1)   January 12, 2017—Interim Order Authorizing Use of Cash Collateral [Dkt. No. 75] (the "Second Interim Order");[2]

(2)   February 6, 2017—Interim Order Authorizing Use of Cash Collateral [Dkt. No. 85] (the "Third Interim Order"); and

(3)   February 13, 2017—Interim Order Authorizing Use of Cash Collateral [Dkt. No. 90] (the "Fourth Interim Order"[3] and collectively with First Interim Order, the Second Interim Order and the Third Interim Order, the "Cash Collateral Orders").

During this same period, DMP took steps to challenge Radio One's secured claim, including engaging special counsel and commencing an adversary proceeding. At the same time, over the course of the Cash Collateral Orders, Radio One's requests and efforts to protect its interests increased in scope and specificity. Each successive Cash Collateral Order increased the extent to which DMP must disclose information and increased the restraint on DMP's ability to transfer funds.

B.   The Second Interim Cash Collateral Order and Tucci Examinations

   1.   *The Second Interim Cash Collateral Order*

While the First Interim Order was fairly unadorned, after the entry of First Interim Order, on January 5, 2017, the meeting of creditors required under section 341 of the Bankruptcy Code (the "341 Meeting") was held. During the 341 Meeting, Tucci appeared on behalf of DMP and admitted that DMP failed to file tax returns for 2014 and 2015. Radio One's Reply in Support of its Second Amended Motion for Civil Contempt [Dkt. No. 199] (the "Reply"), Ex. F. (Transcription of Creditors Meeting Pursuant to Bankruptcy Code Section 341, January 5, 2017) (the "341 Meeting Tr."), at p. 18. Following the 341 Meeting, on the basis of that admission and other alleged failures and omissions, Radio One objected to the further use of cash collateral. *See* Creditor Radio One, Inc.'s Objection and Response in Opposition to Debtor's Motion for Entry of an Order Authorizing Use of Cash Collateral on an Interim Basis [Dkt. No. 67] (the "Cash Collateral Objection").

In light of the Cash Collateral Objection, the Second Interim Order became somewhat more complex. The court ordered DMP to produce its financial information and records to Radio One, including bank statements for any bank account that DMP utilized during the past year, DMP's accounting reports of weekly income, detailed transactions during the bankruptcy case and DMP's invoices and receipts substantiating its postpetition transactions. Second Interim Order, at ¶¶ 2-4. DMP was also required to submit to an examination by Radio One pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). *Id.*, at ¶ 5.

---

[2]   The Second Interim Order removes the reference to Lender, but instead references Radio One specifically.

[3]   The Third and Fourth Interim Orders make no reference to Lender or Radio One, but contain provisions directed at compliance through Radio One's counsel.

4

2.  *The Tucci Examinations*

Following the entry of the Second Interim Order, Radio One conducted an examination of Tucci in his capacity as president of DMP on January 31, 2017 (the "First Tucci Examination"). In this deposition, Radio One discovered previously undisclosed companies, bank accounts and transfers related to DMP. Mot., Ex. A (Dep. Tr. of Dean Tucci) ("Exam I Tr."), at pp. 13-101. Radio One deposed Tucci a second time on April 27, 2017 (the "Second Tucci Examination" and collectively with the First Tucci Examination, the "Tucci Examinations"). Mot., Ex. B (Dep. Tr. of Dean Tucci) ("Exam II Tr.").

The Tucci Examinations allowed Radio One to gather information about DMP's operations and financial disclosures relating to the commencement and continuation of the bankruptcy case. Notably, the Tucci Examinations gave rise to a number of discoveries, including (i) Tucci and DMP's operations without compliance with the duties and constraints of being a debtor in possession, (ii) Tucci's manipulation of cash and debtor and nondebtor bank accounts, (iii) Tucci's use of cash collateral for his personal gain, and (iv) use of cash collateral to pay prepetition debts.

(a)  Failure to Keep Records and Operate as Required

In the Second Tucci Examination, Tucci admitted that the financial records submitted to the court were inaccurate and unreliable. Exam II Tr., at pp. 32-46. Tucci also admitted that DMP's financial records failed to delineate between prepetition debt and postpetition debt, Exam II Tr., at p. 70, and that, after the Petition Date, Tucci continued DMP's operations without any changes due to the bankruptcy. Exam I Tr., at pp. 72-74. DMP itself admitted as much, stating that at least prior to the entry of the Second Interim Order, Tucci operated DMP "without regard to corporate formalities" and without distinction from the Affiliated Entities. Direct Media Power's Objection to Motion for Order Dismissing Case [Dkt. No. 111], at pp. 1-2.

In addition, Tucci did not maintain records as he represented under oath at the 341 Meeting. At the 341 Meeting, Tucci claimed that his accounting staff maintained DMP's financial statements in QuickBooks. 341 Meeting Tr., at p. 53. However, in the Tucci Examinations, Tucci admitted that he personally maintained all of the financial information along with the financial records of the Affiliated Entities in an Excel spreadsheet. Exam I Tr., at pp. 83-84; Exam II Tr., at p. 46. Further, when questioned in the Second Tucci Examination about the accuracy of DMP's monthly operating reports, Tucci testified that he did not believe in the accuracy of certain numbers contained therein, he signed and submitted them nonetheless. Exam II Tr., at pp. 32-39.

While such mismanagement occurring elsewhere might be, at worst, negligent, in this case the appearance is worse, as it was combined with intentional, troubling acts. For example, within two weeks of the entry of the Second Interim Order, Tucci registered Liquidators with the Illinois Secretary of State. Mot., Ex. D (Corporation File Detail Report). According to a sworn statement by one of DMP's former employees, Tucci instructed DMP's sales team to divert new business away from DMP in favor of directing new business to Liquidators. Mot., Ex. E (Decl. of Jeffrey Lerner). Mismanaging DMP makes such actions that much harder to detect.

(b)     Manipulation of Cash and Bank Accounts

The Tucci Examinations also revealed that Tucci questionably managed multiple bank accounts during the bankruptcy case. Exam II Tr., at pp. 8-9. These included a Bank of America bank account in DMP's name ("Account 6530"), Exam I Tr., at pp. 57-58, and another Bank of America account in Teldebt's name, but opened with DMP's tax identification number ("Account 6556"). Exam I Tr., at pp. 64-65.

When asked about DMP's debtor schedules filed on December 28, 2016, Tucci stated at the 341 Meeting that no transfers were made out of Account 6530 other than for paying media bills and employee's wages. 341 Meeting Tr., at pp. 21-22. However, Tucci's later testimony revealed additional, previously undisclosed transfers. Exam II Tr., at pp. 51-53, 69. In addition, during the bankruptcy case, Tucci moved funds from Account 6530 to Account 6556, thereafter paying himself and employees from Account 6556. Exam I Tr., at p. 65. Tucci also used those funds to pay expenses of Teldebt. Exam I Tr., at p. 81.

Similar activity occurred between DMP and the Affiliated Entities. Through his majority ownership and control of both DMP and the Affiliated Entities, Exam I Tr., at pp. 14-16, even after the commencement of the bankruptcy case, Tucci continued to move funds "back and forth" between the Affiliated Entities and DMP to "address liquidity needs and other business purposes." Exam II Tr., at pp. 49-51. Since the commencement of the bankruptcy case, Tucci transferred over $800,000.00 between DMP and the Affiliated Entities. Exam II Tr., at pp. 46-51. Tucci's transfers between DMP and Affiliated Entities resulted in a net distribution of over $300,000.00 from DMP's bank accounts to the Affiliated Entities and Tucci. *Id.*

Equally troubling, Radio One discovered that Tucci operated DMP under the name "DMP Teleservices" ("Teleservices"). Exam I Tr., at p. 62. Teleservices had two of its own bank accounts. Exam I Tr., at pp. 62-64 ("Account 6543"), Exam I Tr., at p. 50 ("Account 7452"). Teleservices is not, however separate from DMP. It is a "d/b/a of DMP." Exam I Tr., at p. 62.[4] According to Tucci's own testimony, he transferred funds from Account 6530 to the Account 6543. Onge again, out of that account, Tucci then paid himself and employees. Exam I Tr., at pp. 62-67.

(c)     Use of Cash Collateral for Personal Gain

As noted above, in several different ways, Tucci manipulated the cash and the cash accounts to arrange payments to himself. Exam I Tr., at pp. 62-67. Tucci confirmed that, during 2016, he transferred over $100,000.00 of DMP's funds, in excess of his salary, to his own personal checking account. Exam I Tr., at pp. 51-53. When asked about these transfers, Tucci referred to the payments as "income" and "distributions." *Id.* Tucci also testified that the payments "could be an advance" for "sales" but admitted that the payments were not debt owed to him. *Id.*

DMP and Tucci also contend that these transfers and the transfers to the Affiliated Entities were "substantial loans" between DMP, the Affiliated Entities and Tucci. Debtor Direct Media

---

[4]     The only bank account disclosed on DMP's official schedules was Account 6530. Official Form 206A/B [Dkt. No. 61], at p. 1. Though DMP later amended its schedules to report other bank accounts, Official Form 206A/B [Dkt. No. 77], at p. 1, to date, Account 7452 has never been scheduled by DMP.

Power, Inc. and Interested Party Tucci's Response to Creditor Radio One's Second Amended Motion for Civil Contempt [Dkt. No. 194] (the "Response"), at p. 2. This assertion conflicts with Tucci's testimony. Exam II Tr., at pp. 69-70. Most importantly, no documents to substantiate the claim that these transfers were legitimate loans have been offered.

        (d)        Use of Cash Collateral to Pay Prepetition Obligations

Neither the Cash Collateral Orders nor any other order of the court authorized the payment of any debt arising before the commencement of the bankruptcy case, a fact Tucci was aware of. Exam I Tr., at p. 70. Tucci admitted nonetheless in the Tucci Examinations that he used separate bank accounts to pay some debts while avoiding paying other debts. Exam I Tr., at p. 80. Tucci utilized the Affiliated Entities to avoid the constraints of bankruptcy, transferring funds from DMP to the Affiliated Entities and used those funds to pay prepetition debts owed by DMP. Exam II Tr., at pp. 46-49. In addition to the payments to himself and employees, Tucci admitted to paying media vendors on account of their prepetition claims, not just their postpetition ones. Exam I Tr., at pp. 67-74. In addition to the foregoing, DMP made no disclosure of those payments in the context of the cash collateral hearings. Exam II Tr., at pp. 69-70.

C.    The Third and Fourth Interim Cash Collateral Orders

In part as a result of the Tucci Examinations, the Third Interim Order prohibited DMP from transferring any funds to any companies in which Tucci had any direct or indirect ownership interest. DMP was authorized to pay preapproved expenses only out of Account 6530 for "only those categories of expenses and in the amounts listed on the budget." Third Interim Order, at ¶ .2. Furthermore, DMP could only transfer funds if Radio One's counsel approved the transfer in writing. *Id.* at ¶ .5. This court prohibited DMP from using any of the other bank accounts of DMP, Teleservices and Teldebt until further court order. *Id.* at ¶ .3 Nonetheless, one day after the Third Interim Order was entered, on February 7, 2017, Tucci transferred $14,000.00 from yet another undisclosed DMP account ("Account 8690") to Teldebt's Account 7452 in direct violation of the Third Interim Order. Mot., Ex. 1 to Rosenfeld Decl. (Expert Report of Jason Wright) (the "Expert Report"), at p. 13. Tucci continued to make transfers out of Account 7452 during the period of February 7, 2017 through February 14, 2017. Expert Report, at pp. 13-15.

The Fourth Interim Order continued the limitations imposed on DMP by the Third Interim Order with a few additions. DMP was ordered to close Account 6556 and transfer all funds in that account into Account 6530. Fourth Interim Order, at ¶ .8. However, Tucci continued to make transfers between himself and the Affiliated Entities. Following the Fourth Interim Order, Tucci made numerous transfers from FDTAR's bank account at U.S. Bank. Expert Report, at pp. 12-15.

Tucci transferred funds from DMP and the Affiliated Entities to his own personal bank accounts in direct violation of the Cash Collateral Orders. On February 22, 2017, DMP transferred $2,600.00 from Account 8690 to a personal account owned by Tucci. Expert Report, at p. 13. Even if DMP's transfer to Tucci was properly accounted for an authorized purpose, Tucci still violated the prohibition on using other bank accounts owned by DMP. Third Interim Order; Fourth Interim Order. Tucci's personal bank account received additional funds from a bank account owned by FDATR in March. Expert Report, at pp. 13-14.

D.   Radio One's Attempts to Compel Compliance

In addition to negotiating even tighter controls on DMP's operations and use of cash collateral, Radio One took several steps to compel DMP's compliance with the Cash Collateral Orders and DMP's obligations as a debtor in bankruptcy.

After the First Tucci Examination and just before midnight on March 7, 2017, Radio One sought an emergency hearing on a contempt motion, seeking to have the bankruptcy case dismissed and to have the court sanction DMP and Tucci for alleged violations of court orders. Creditor Radio One, Inc.'s Emergency Motion to Dismiss and for Civil Contempt [Dkt. No. 95] (the "First Contempt Motion"). On March 8, 2017, the court granted the request for an emergency hearing, setting the hearing for the following day. Order [Granting Application to Set Hearing on Emergency Motion] [Dkt. No. 96].

The court therefore heard argument on the First Contempt Motion on March 9, 2017 (the "Emergency Hearing"). Despite appearing on an expedited, emergency basis, Radio One came to the Emergency Hearing showing that they had prepared well in advance, including large, professionally prepared demonstrative exhibits. Were the court to have proceeded with the Emergency Hearing on such an uneven footing, DMP would have been denied substantive due process on the matter in question. The court therefore refused to entertain the exhibits or the bulk of Radio One's request at the Emergency Hearing.

As a result, the court continued the First Contempt Motion for further hearing on April 19, 2017. Interim Order on Motion to Dismiss and for Contempt [Dkt. No. 104] (the "Interim Contempt Order"). Nonetheless, to preserve the *status quo* in the interim, the Interim Contempt Order stated that no party would be permitted to transfer any assets of DMP or assets located in the DMP's facilities without further court order. *Id.* at ¶ 3. DMP was also to cease any diversion of sales to other entities or use of estate property for sales by other entities. *Id.* at ¶ 4.

Following the Emergency Hearing and before DMP submitted its response to the First Contempt Motion, Radio One next filed a motion to compel DMP and Tucci to produce financial information for any account owned by DMP, Tucci and the Affiliated Entities. Motion to Compel [Dkt. No. 107]. On March 21, 2017, after a hearing on the Motion to Compel, the court granted the request. Order Compelling Debtor to Produce Documents [Dkt. No. 108] (the "Production Order"). The Production Order required DMP to submit to Radio One copies of all checks written out of any account owned by DMP, Tucci or the Affiliated Entities since the commencement of the bankruptcy case. *Id.* at ¶ 1.

DMP responded with a written objection to the First Contempt Motion on March 24, 2017, and by agreement, the continued hearing on the First Contempt Motion was further continued to May 3, 2017. On May 2, 2017, the night before the continued hearing on the First Contempt Motion, DMP filed its Motion to Convert Chapter 11 Case to Case under Chapter 7 of the Bankruptcy Code [Dkt. No. 125] (the "Motion to Convert"). On May 3, 2017, the court heard argument on both the Motion to Convert and the First Contempt Motion and determined that conversion of the bankruptcy case was proper to allow a trustee to assess and control the bankruptcy estate. Order Converting Case Under Chapter 11 to Case Under Chapter 7 [Dkt. No. 131]. Finding that conversion did not moot all of the relief requested by Radio One, the First Contempt Motion was continued to June 21, 2017.

Following the conversion, David Brown was appointed as chapter 7 trustee (the "Trustee"). Letter of Appointment [Dkt. No. 132]. The Trustee subsequently held another meeting of creditors pursuant to section 341 of the Bankruptcy Code and found assets to administer. Nonetheless, after resolving other matters in the case, the Trustee concluded that there was no business justification for pursuing the assets of DMP and that the bankruptcy estate was administratively insolvent. The Trustee filed the Motion to Dismiss Chapter 7 Case [Dkt. No. 152] (the "Motion to Dismiss") on this basis.

Before the court could hear the Motion to Dismiss, Radio One filed Creditor Radio One, Inc.'s Amended Motion for Civil Contempt on July 14, 2017. [Dkt. No. 155] (the "Amended Contempt Motion"). Faced once again with conflicting motions, the court set briefing on the matters. The court requested briefing on two issues, first, whether an order dismissing the case would prejudice the claim for civil contempt and second, if dismissal would prejudice contempt, whether the court should dismiss the case in any case. Of particular concern to the court was that Radio One might be denied a right to be heard on these issues in the event of a dismissal.

Prior to briefing, having fulfilled his obligations as chapter 11 counsel to DMP, Wolf withdrew and attorney John H. Ray ("Ray"), the present counsel to Tucci and DMP, appeared for the purpose of defending the remaining issues. On August 22, 2017, on behalf of both DMP and Tucci, Ray filed a response on the limited issues under consideration. Debtor Direct Media Power, Inc. and Interested Party Dean Tucci's Procedural Opposition to Creditor Radio One's Motion for Civil Contempt [Dkt. No. 164]. Radio One replied. Creditor Radio One, Inc.'s Reply Brief in Support of its Amended Motion for Civil Contempt [Dkt. No. 167].

On September 20, 2017, the court conducted a further hearing on the matter, concluding therein that it may maintain jurisdiction to hear the request for sanctions in this bankruptcy case between the parties even after dismissing the case. On that same day, the court therefore dismissed the bankruptcy case pursuant to section 707(a) of the Bankruptcy Code. Order Granting Motion to Dismiss Debtor [Dkt. No. 173] (the "Dismissal Order"). The Dismissal Order expressly retained jurisdiction on this matter, stating that "[t]he court retains jurisdiction over the request by Radio One, Inc. for contempt against the Debtor and Dean Tucci." *Id.* at ¶ 3.

The court also granted Radio One leave to amend its request for contempt so as to reflect the changes that had occurred and set a briefing schedule with respect thereto. Order [Scheduling Motion for Civil Contempt] [Dkt. No. 178].

In compliance with that order, on October 10, 2017, Radio One filed a further amended motion, the Motion at bar. In the Motion, DMP seeks an order of civil contempt against DMP and Tucci under section 105 of the Bankruptcy Code, Bankruptcy Rules 9014 and 9020 and Rule 9020-1 of the Local Rules for the United States Bankruptcy Court of the Northern District of Illinois. Radio One seeks recovery of attorneys' fees Radio One incurred from DMP's and Tucci's alleged fraud, abuse of process and multiple violations of the Cash Collateral Orders as well as violations of the automatic stay.

DMP and Tucci filed the Response on November 6, 2017. The Response argues that Radio One failed to establish sufficient evidence for civil contempt under section 105 of the Bankruptcy Code. The Response also alleges that the Motion is barred by laches because of Radio One's

9

unreasonable delay in bringing the claims.[5] On November 29, 2017, Radio One filed the Reply. Radio One argues that it can prove its claims for civil contempt by clear and convincing evidence. The Reply rebuts DMP and Tucci's allegation of unreasonable delay alleging that the delay in this case was in fact caused by DMP and Tucci.

On December 5, 2017, the court conducted a hearing (the "Hearing") on the Motion, at which counsel for Radio One and counsel for DMP and Tucci presented arguments in support of their respective positions. At the conclusion of the Hearing, the matter was taken under advisement.

In considering the matter under advisement, the court has reviewed the Motion, the Response and the Reply[6] and has considered the arguments of the parties at the Hearing. Having conducted that review, except as expressly set forth herein, this Memorandum Decision constitutes the court's determination of all matters under advisement.

## DISCUSSION

Before the court is the Motion against DMP and Tucci seeking damages for attorneys' fees and costs incurred due to alleged civil contempt. In support of its Motion, Radio One alleges Tucci and DMP violated orders of this court. Radio One argues Tucci violated the Cash Collateral Orders and automatic stay by comingling DMP's accounts and transferring funds of DMP to the Affiliated Entities. In response to the Motion, DMP asserts that Radio One fails to demonstrate any violation of a court order by DMP or Tucci.

A.   Authority to Impose Sanctions for Civil Contempt

It has been noted that the bankruptcy court is in a better position to award sanctions than the district court when the majority of the debtors' questionable activities occurred in bankruptcy court. *Rinaldi v. HSBC Bank USA, N.A.*, Case No. 13-CV-336-JPS, 2013 WL 5876233, at *10 (E.D. Wis. Oct. 31, 2013), *aff'd sub nom. In re Rinaldi*, 778 F.3d 672 (7th Cir. 2015).

The Supreme Court has noted that, when exercising that prerogative, bankruptcy courts have both statutory and inherent powers to manage matters of contempt before them. *Law v. Siegel*, — U.S. —, 134 S. Ct. 1188, 1194 (2014).

> A bankruptcy court has statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). And it may also possess "inherent power …

---

[5]   The court can find no evidence of delay, unreasonable or otherwise, in this matter. While, as the history set forth *infra* makes clear, this matter has been extensive and protracted, it appears clear to the court that Radio One has, at every step along the way, been vigilant in asserting both its rights generally and on the cause addressed herein.

[6]   The court has also taken into consideration any and all exhibits submitted in conjunction with the foregoing. Though these items do not constitute an exhaustive list of the filings in the contested case, the court has taken judicial notice of the contents of the docket in this matter. *See Levine v. Egidi*, Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 2011) (Goldgar, J.) (recognizing same).

to sanction 'abusive litigation practices.' " *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 375-376 (2007).

*Id.*

The statutory power is clear. Section 105 grants broad powers to bankruptcy courts to implement the provisions of the Bankruptcy Code and to prevent an abuse of the bankruptcy process. *Volpert*, 110 F.3d at 500. Section 105 has also been held to authorize a court to consider contempt remedies for violations of the express provisions of the Bankruptcy Code itself. *Paloian v. Grupo Serla S.A. de C.V.*, 433 B.R. 19, 41 (N.D. Ill. 2010); *cf. Zale*, 239 F.3d at 916-17 (party who violates a statute triggered by court order is in contempt of the order).

The inherent power, though not delineated, also clearly exists. *Marrama*, 549 U.S. at 383. ("Bankruptcy courts have used their statutory and equitable authority to craft various remedies for a range of bad faith conduct: … penalizing counsel; assessing costs and fees; or holding the debtor in contempt.") (footnote omitted); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (*citing Ex parte Robinson*, 86 U.S. 505, 510 (1873)) ("The power to punish for contempts is inherent in all courts.").

The Seventh Circuit has stated that "[a] sanctioning court should ordinarily rely on available authority conferred by statutes and procedural rules, rather than its inherent power, if the available sources of authority would be adequate to serve the court's purposes." *In re Rimsat, Ltd.*, 212 F.3d 1039, 1048-49 (7th Cir. 2000) (*citing Chambers*, 501 U.S. at 50; *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 142 F.3d 1041, 1058-59 (7th Cir. 1998)). Thus, the bankruptcy court should look first to section 105 in circumstances such as these.

In *Rimsat*, the Seventh Circuit confirmed that the power under section 105 suffices. *Rimsat*, 212 F.3d at 1049; *Zale*, 239 F.3d at 916-17 (bankruptcy courts' "power to determine civil contempt is explicitly conferred"); *In re Whitlock-Young*, 571 B.R. 795, 810 (Bankr. N.D. Ill. 2017) (Barnes, J.) ("It is clear that bankruptcy courts have the power of civil contempt."). Bankruptcy Rule 9020 further recognizes that authority. Fed. R. Bankr. P. 9020(b) ("Rule 9014 governs a motion for an order of contempt made by the United States trustee or a party in interest.").

As with jurisdiction, however, because of the nebulous nature of the bankruptcy courts, it is also necessary to ask whether the power statutorily conferred to the bankruptcy court is constitutional. In this District, the District Court has concluded that it is, *In re Schatz*, 122 B.R. 327, 329 (N.D. Ill. 1990), and this court has no reason to question that conclusion. That said, the court should only exercise such power within the confines of bankruptcy matters. Bankruptcy courts may not contravene specific statutory provisions. *Marrama*, 549 U.S. at 383.

B. <u>Civil Contempt Separate from Criminal Contempt</u>

In exercising the foregoing authority, the court is making a determination with respect to civil contempt alone, though "[c]ommon sense would recognize that conduct can amount to both civil and criminal contempt." *United States v. United Mine Workers*, 330 U.S. 258, 298-99 (1947). While a bankruptcy court's power of criminal contempt is undecided in this Circuit, *Zale*, 239 F.3d at 916 ("[I]t is unsettled whether bankruptcy judges have criminal-contempt powers."), the civil contempt power is, as noted above, clearly conferred.

The court need not consider further the question of criminal contempt, as the matter before the court is clearly civil. Civil contempt is intended to rectify, not to punish. Among the standard remedies for civil contempt are restitution and reasonable attorneys' fees. *Zale*, 239 F.3d at 916; *see also United Mine Workers*, 330 U.S. at 303-04; *Shakman v. Democratic Org. of Cook County*, 533 F.2d 344, 349-50 (7th Cir.), *cert. den.* 429 U.S. 858 (1976). Radio One's requested remedies are within these constraints.

C.     Civil Contempt Standards

DMP contends that Radio One cannot meet the burden to show any specific acts by DMP or Tucci that merit civil contempt. Relying on *Stotler & Co. v. Able*, DMP argues further that Radio One must meet the burden of clear and convincing evidence for civil contempt. 870 F.2d 1158, 1163 (7th Cir. 1989). In *Stotler*, the movant proceeded under Rule 11 of the Federal Rules of Civil Procedure, not section 105 of the Bankruptcy Code. The Seventh Circuit therein held that, to hold a party in contempt, the court

> "must be able to point to a decree from the court which 'set[s] forth in specific detail an unequivocal command' which the party in contempt violated." *Ferrell v. Pierce*, 785 F.2d 1372, 1378 (7th Cir. 1986) (*quoting H.K. Porter Co. v. Nat'l Friction Prods.*, 568 F.2d 24, 27 (7th Cir. 1977)). A complaining party must prove that the order was violated by "clear and convincing" evidence. *See, e.g., United States v. Huebner*, 752 F.2d 1235, 1241 (7th Cir.), *cert. denied*, 474 U.S. 817 (1985). A district court ordinarily does not have to find that the violation was "willful" to find a party in contempt, *see Commodity Futures Trading Comm'n v. Premex, Inc.*, 655 F.2d 779, 784 n. 9 (7th Cir. 1981), and it may find a party in civil contempt if he has not been "reasonably diligent and energetic in attempting to accomplish what was ordered." *American Fletcher Mortgage Co. v. Bass*, 688 F.2d 513, 517 (7th Cir. 1982) (citation omitted).

*Stotler*, 870 F.2d at 1163.

Tucci and DMP are correct in asserting that civil contempt is only appropriate if the moving party shows by clear and convincing evidence that the nonmoving party violated a court order. *Id.*; *see also In re Res. Tech. Corp.*, 624 F.3d 376, 387 (7th Cir. 2010). "For [a party] to be held in civil contempt, he must have violated an order that sets forth in specific detail an unequivocal command from the court." *United States v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001).

However, in considering this standard, the court is mindful that the violation of the court order does not have to be "willful" to find contempt. *In re Gage*, 394 B.R. 184, 196 (Bankr. N.D. Ill. 2008) (Squires, J.) (*citing Stotler*, 870 F.2d at 1163). Rather, the standard is "knowing." *Gage*, 394 B.R. at 196 (*citing In re Johnson*, 148 B.R. 532, 538 (Bankr. N.D. Ill. 1992) (Squires, J.)). Further, contempt may be found if the actor has not been "reasonably diligent and energetic in attempting to accomplish what was ordered." *Am. Fletcher Mortg. Co. v. Bass*, 688 F.2d 513, 517 (7th Cir. 1982); *see Gage*, 394 B.R. at 196; *see also In re Sekendur*, 334 B.R. 609, 621 (Bankr. N.D. Ill. 2005) (Schmetterer, J.).

While the Cash Collateral Orders are less than ideal, the court finds them to be sufficiently detailed to meet these standards, especial when considered in light of the statutory constraints on

debtors. Debtors in bankruptcy are constrained by the obligations conferred upon them in by the Bankruptcy Code. A debtor in possession owes a fiduciary duty to his creditors. *In re Scott*, 172 F.3d 959, 967 (7th Cir. 1999). DMP, as a debtor in possession in chapter 11, had all of the duties "of a trustee serving in a case" under that chapter. 11 U.S.C. § 1107(a); *see also Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) (holding that a trustee also owes fiduciary duties to a debtor's creditors). Among the constraints on DMP was the obligation not to use cash collateral without the consent of those with an interest in that cash collateral or authority of the court. 11 U.S.C. § 363(c)(2)(A) & (B). DMP was further obligated to segregate and account for the cash collateral in its possession. 11 U.S.C. § 363(c)(4). Bankrupt debtors have an absolute duty to report whatever interests they hold in property. *United States v. Persfull*, 660 F.3d 286, 295 (7th Cir. 2011) (*citing United States v. Van Allen*, 524 F.3d 814, 822 (7th Cir. 2008)).

When the court authorized the use of cash collateral, it follows then that the authorization was no greater than that contained in the order itself. The Cash Collateral Orders set the parameters on the use of cash collateral, including both the positive and negative limits. When DMP and Tucci exceeded those limits, they violated the terms of the Cash Collateral Orders. Were that not enough, as in *Zale*, a violation of the terms of the statute that the order effectuates is a violation of the order itself. *Zale*, 239 F.3d at 916-17; *Paloian*, 433 B.R. at 41.

Here, while the language varied, all of the Cash Collateral Orders made clear in one form or another that the authority to use cash collateral was "for only those categories of expenses and in the amounts listed on the Budget attached ...." *See, e.g.*, Second Interim Order, at ¶ 6. Use of cash collateral in another manner violated the terms of the applicable Cash Collateral Order. *Cf. In re Southbelt Props. Mgmt., LLC*, Case No. 10-80254-G3-7, 2011 WL 309426, at *3 (Bankr. S.D. Tex. Jan. 28, 2011).

Throughout the bankruptcy case, DMP acted in a manner inconsistent with its obligations as a debtor, and those actions were personally performed by Tucci. He was the officer responsible for DMP's compliance. DMP's misuse of cash collateral, however, was particularly egregious as it actively impeded the purpose of the bankruptcy case. None of the Cash Collateral Orders authorized payments to the Affiliated Entities. None of them permitted the excessive payments to Tucci or on account of prepetition claims. None of them permitted DMP to comingle its cash, or to fail to account for it. Despite the specific prohibition on transfers by Affiliated Entities contained in the Third Collateral Order and Fourth Collateral Order, Tucci continued to transfer funds as he pleased between himself, DMP and Affiliated Entities.

Chapter 11 bankruptcy cases endeavor to capture the going concern value of a debtor's business while providing payments to creditors. *See generally Czyzewski v. Jevic Holding Corp.*, — U.S. —, 137 S. Ct. 973 (2017). As Tucci's contradictory testimony cited above illustrates, Tucci utilized the bankruptcy case as a tactic to confuse and delay creditors while he siphoned off DMP's assets to the Affiliated Entities and Tucci's personal account. The web of business entities, bank accounts and fund transfers woven by Tucci resembles a pattern of evasion rather than a mere string of accounting errors. The conclusion is unavoidable that the violations of the Cash Collateral Orders was intentional. At the very least, these violations were knowing.

For all of these reasons, the court finds that the evidence of Tucci's and DMP's actions, as set forth *infra* in the background section, is clear and convincing. Tucci and DMP knowingly

violated the Cash Collateral Orders of this court, and therefore are in contempt of the Cash Collateral Orders.

D.      Civil Contempt Imposed on Individual Responsible for Entity DMP's Compliance

In considering whether sanctions are appropriate, the court must consider, among other things, whether the target of the sanctions has been clearly and unequivocally notified of the allegedly sanctionable behavior and been afforded an opportunity to mitigate potentially applicable damages. *In re Narowetz Mech. Contractors, Inc.*, 99 B.R. 850, 862 (N.D. Ill. 1989).

It is well established that an individual officially responsible for a corporation's compliance with a court order may be punished for contempt if he fails to act appropriately. *Tranzact*, 406 F.3d at 856; *see Connolly v. J.T. Ventures*, 851 F.2d 930, 935 (7th Cir. 1988). Tucci was DMP's head officer and, as such, responsible for its actions. He kept the books and controlled the accounts. He exerted control over DMP's daily operations and authorized every transaction. It was Tucci's own actions that created the noncompliance by DMP. Further, at every step along the way, Radio One called into question DMP's and Tucci's actions. Each had clear notice of the problems with behavior in question yet continued that behavior nonetheless. DMP and Tucci have also been afforded due process with respect to the Motion. The court therefore finds that the predicates have been met to hold Tucci in contempt for the actions in DMP's bankruptcy case.

E.      Determination of Damages

The Seventh Circuit has made clear that an award of attorneys' fees in contempt proceedings is at the court's discretion. *Tranzact*, 406 F.3d at 855 (*citing Premex*, 655 F.2d at 785).

Here, it is facially obvious that Tucci's and DMP's actions caused Radio One to incur significant attorneys' fees, both in responding to DMP's requests to the court, investigating Tucci and DMP, and in bringing its own requests for affirmative relief. Radio One has not yet submitted those fees. For it to do so, the court requires Radio One to submit actual time sheets in the manner ordinarily submitted by counsel seeking compensation from a bankruptcy estate. Such time sheets may, of course, be minimally redacted to protect confidential/privileged matters. The submission should include applicable expenses.

As the court calculates the amount of damages for sanctions by DMP and Tucci, it is mindful of the need to apportion any damages awarded. When each party appears individually liable for the damages in question, joint and several liability is appropriate. *Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 709-10 (7th Cir. 2014) (joint and several sanctions imposed under section 1927 of title 28 of the United States Code). Joint and several liability applies under "general principles of agency law, an agent whose tortious conduct renders the principal liable is also liable for his own tortious acts." *In re Vazquez*, 221 B.R. 222, 231 (Bankr. N.D. Ill. 1998) (Squires, J.). Here, the court sanctions DMP and Tucci each directly. Tucci and DMP both knowingly participated in their own sanctionable conduct. Tucci and DMP are jointly and severally liable for the damages caused by their sanctionable conduct.

While the court will be the final arbiter of what fees are reasonable in this regard, *Zale*, 239 F.3d at 916, Radio One is instructed to review carefully its fees and expenses in advance of submission. This court will not award attorneys' fees to a moving party *carte blanche*. Not every fee

or expense relates to Tucci's and DMP's contempt, and over assertion of fees and expenses will result in reduction, not increase. By separate order entered concurrently herewith, the court will set a deadline for the submission.

## CONCLUSION

The Motion establishes clear and convincing evidence that Tucci and DMP knowingly violated orders of this court, and are therefore in contempt of those orders. Radio One's Motion is, therefore, GRANTED.

By separate order issued concurrently herewith, the court will award Radio One, as the party directly affect by the contempt and the movant hereunder, its reasonable attorneys' fees on matters directly related to the actions in question, in an amount to be determined by the court.

Dated: March 29, 2018

Timothy A. Barnes
United States Bankruptcy Judge